IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**DERRICK IVAN JIM,**

    Petitioner,

v.                                                                                                         **Civ. No. 21-507 JB/DLM**
                                                                                                           **Cr. No. 10-2653 JB/GBW**

**UNITED STATES OF AMERICA,**

    Respondent.

**MAGISTRATE JUDGE'S PROPOSED
FINDINGS AND RECOMMENDED DISPOSITION[1]**

In a plea agreement, Petitioner Derrick Ivan Jim confessed to raping K.T. Despite Jim's later withdrawal of the plea, his confession was admitted at trial under Federal Rule of Evidence 410, and a jury convicted Jim of two counts of aggravated sexual abuse. Now before the Court is Jim's pro se Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Doc. 1), filed June 1, 2021, in which Jim argues that he was deprived of effective assistance of counsel because his trial counsel failed to adequately challenge the admission of his confession.[2] The United States of America responded in opposition to the Motion on February 23, 2023. (Doc. 9.) Jim filed a reply on March 20, 2023. (Doc. 10.) Because the Motion and record conclusively establish that Jim is not entitled to relief, an evidentiary hearing

---

[1] United States District Judge James O. Browning referred this case to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B), (b)(3) and *Virginia Beach Federal Savings & Loan Association v. Wood*, 901 F.2d 849 (10th Cir. 1990), on April 13, 2023. (Doc. 12.)

[2] Because Jim is proceeding pro se, the Court construes his pleadings liberally but does not assume the role of his advocate. *See United States v. Pinson*, 584 F.3d 972, 975 (10th Cir. 2009) ("[W]e must construe [a pro se litigant's] arguments liberally; this rule of liberal construction stops, however, at the point at which we begin to serve as his advocate.").

is unnecessary. *See* 28 U.S.C. § 2255(b); *United States v. Flood*, 713 F.3d 1281, 1291 (10th Cir. 2013). Having carefully considered the parties' submissions, the record, and the relevant law, the undersigned RECOMMENDS that the Court DISMISS Jim's Motion.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In September 2010 and, in a superseding indictment entered in December 2021, a grand jury charged Jim with two counts of aggravated sexual abuse in violation of 18 U.S.C. §§ 1153, 2241(a)(1) and 2246(2)(A). (CR Docs. 13;[3] 58.) The Court appointed Assistant Federal Public Defender James C. Loonam to represent Jim. (CR Doc. 5.)

### A.     The Plea Agreement, Plea Hearing, and Statement of Responsibility

In February 2011, Jim signed a Plea Agreement with the United States. (CR Doc. 25.) The Plea Agreement included statements that Jim "has thoroughly reviewed all aspects of this case with [his] attorney and is fully satisfied with that attorney's legal representation," and "understands [his] right[] to plead not guilty, . . . to have a trial by jury[] and at a trial[,] to . . . be protected from compelled self-incrimination." (*Id*. at 1.) A section titled "Waiver of Rights and Plea of Guilty" stated that Jim "agrees to waive these rights and to plead guilty to the indictment, charging . . . aggravated sexual abuse." (*Id*. at 2.)

A section titled "Defendant's Admission of Facts" included the following language:

> By my signature on this plea agreement, I am acknowledging that I am pleading guilty because I am, in fact, guilty of the offense to which I am pleading guilty. I recognize and accept responsibility for my criminal conduct. Moreover, in pleading guilty, I acknowledge that if I *chose to go to trial instead of entering this plea*, the United States could prove facts sufficient to establish my guilt of the offense to which I am pleading guilty beyond a reasonable doubt.

---

[3] References to "CR Doc." are to the docket in *United States v. Jim*, Cr. No. 10-cr-2653 JB/GBW (D.N.M.), the underlying criminal case.

2

(*Id*. at 3 (emphasis added).) The Plea Agreement further stated, "I specifically admit the following facts related to the charges against me, and declare under penalty of perjury that all of these facts are true and correct[,]" under which was the following bolded statement (the "Admission of Facts"):

> I, Derrick Ivan Jim, am an enrolled member of the Navajo Nation and hold myself out as an Indian. On the evening of August 12, 2010, I was taken[4] to the house of [K.T.] to hang out and drink alcohol with [K.T.] and some of her friends. Prior to August 12th, I did not know [K.T.] or her friends. [K.T.]'s house is located in Fruitland, New Mexico within the exterior boundaries of the Navajo Nation. At one point in the early morning hours of August 13, 2010 [K.T.] went into the house and I followed her. She laid down on the couch in her living room. I then dragged her to a back bedroom of her house. I then engaged in both vaginal and anal intercourse with [K.T.] against her will and by using force. She fought me off and I left the house.

(*Id*. at 3–4.) After the Admission of Facts is a statement which provides, "[b]y signing this agreement, [Jim] admits that there is a factual basis for each element of the crime to which [he] will plead guilty." (*Id*. at 4.)

> The Plea Agreement included the following stipulation between the United States and Jim:
>
> Except under circumstances where the Court, acting on its own, fails to accept this plea agreement, [Jim] agrees that, upon [his] signing of this plea agreement, the facts that [Jim] has admitted under this plea agreement as set forth above, as well as any facts to which [he] admits in open court at [his] plea hearing, shall be admissible against [him] under Federal Rule of Evidence 801(d)(2)(A) in any subsequent proceeding, including a criminal trial, and [Jim] expressly waives [his] rights under Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 with regard to the facts [he] admits in conjunction with this plea agreement.

(*Id*. at 5.) Under the heading "Voluntary Plea," the Plea Agreement stated that Jim "represents that this plea of guilty is freely and voluntarily made and is not the result of force, threats, or promises

---

[4] The factual basis originally stated that Jim "went to the house of" K.T. *Id.* Jim disagreed with that statement and, while on the record during the change of plea hearing, Jim, his attorney, and the Assistant United States Attorney modified the sentence by hand to state that Jim "was taken to the house of" K.T. (CR Docs. 25 at 3; 52 at 12:20–24.)

(other than the promise set forth in this agreement). There have been no promises from anyone as to what sentence the Court will impose." (*Id*. at 7–8.) It further provides, "[Jim] also represents that [he] is pleading guilty because [he] is in fact guilty." (*Id*. at 8.) Just above Jim's signature is the following certification: "I have read this agreement and carefully reviewed every part of it with my attorney. I understand the agreement and voluntarily sign it." (*Id*. at 9.) *See also United States v. Jim*, 786 F.3d 802, 812 (10th Cir. 2015) (discussing the Plea Agreement).

Then-Chief United States Magistrate Judge Richard L. Puglisi held Jim's change of plea hearing the same day the parties entered into the Plea Agreement. (CR Docs. 26; 52.) At the Plea Hearing, Jim stated under oath that he had reviewed his Plea Agreement with his attorney, that he had read it himself, that he understood it, and that he did not have any questions about anything related to the plea. (CR Doc. 52 at 4:10–19.) He also stated that he had signed the Plea Agreement and that he was "in all respects satisfied with Mr. Loonam as [his] attorney." (*Id*. at 4:20–24.) Judge Puglisi did not explicitly tell Jim that he was waiving his right to a jury trial by signing the Plea Agreement. (CR Doc. 52.) Judge Puglisi asked Jim if he had "engage[d] in [a] sexual act with [K.T.] by using force on [K.T.]," to which Jim responded, "Yes, sir." (*Id*. at 8:17–22.) At the end of the hearing, Judge Puglisi accepted Jim's guilty plea, but deferred acceptance of the Plea Agreement. (CR Docs. 26; 52 at 13:16–20); *Jim*, 786 F.3d at 807.

On March 22, 2011, Jim signed the following statement ("Responsibility Statement") to the probation officer preparing the presentence report:

> On the evening on [sic] August 12, 2010, I, Derrick Ivan Jim, was brought to the house of [K.T.] by a friend of mine. We went there to hang out and drink alcohol with [K.T.] and some of her friends. Prior to August 12th, I did not know [K.T.] or her friends. At one point in the early morning hours of August 13, 2010 [K.T.] went into the house and I followed her. She laid down on the couch in her living room. I then used physical force to engage in a sexual act with [K.T.] against her will. I was very intoxicated at the time and I am deeply sorry for my actions. I take full responsibility for my actions in this matter.

4

(CR Doc. 98 at 48 (quoting Presentence Investigation Report ¶ 29, at 10 (disclosed April 1, 2011)).)

B. **Jim's Request for Appointment of New Counsel**

Approximately three months after he signed the Plea Agreement, Jim, acting pro se, wrote two letters to the Court and filed a motion requesting a new appointed attorney. (CR Docs. 30; 32–33.) In one of the letters, Jim wrote that Loonam "rushed [him] into signing the plea, which [he] did not understand to[o] well, [and he] still had a[]lot of questions that were unanswered." (CR Doc. 33.) He also asserted that he "wanted to pull [his] plea the very next day" and that Loonam had "not helped [him] as much as he could have done . . . ." (*Id.*) The Court held an ex parte hearing, at which Jim told the Court that he believed that, despite signing the Plea Agreement, he would still go to trial and that he did not understand the ramifications of signing the Plea Agreement. *Jim*, 786 F.3d at 807; (CR Docs. 184–185). Jim was not under oath at that hearing. (CR Docs. 184–185.) Before the Court entered an order granting Jim's motion to appoint a new attorney, Jim retained Lawrence Chacon as his new counsel. *Jim*, 786 F.3d at 807; (CR Docs. 35; 39.)

C. **Jim's Motion to Withdraw the Plea**

Jim, through Chacon, moved to withdraw the guilty plea, arguing that "the original plea was without full understanding and arguably it was not voluntary" and referencing Jim's letters to the Court regarding his request for appointment of new counsel. (CR Doc. 48 at 2.) In its ruling on the motion, the Court noted that Chacon argued at the motion hearing that (1) the plea colloquy was deficient and "hasty," (2) Jim had to "confer with his attorney before speaking to Judge Puglisi at the plea hearing, (3) "whether there was clear communication between Mr. Loonam and Jim goes directly to the plea's voluntariness," and (4) Jim did not understand the Plea Agreement

5

because he came from a "different culture." (CR Doc. 53 at 18–19; 76 at 13, 24.) He did not argue that Jim did not sign the Plea Agreement knowingly and voluntarily because he did not understand he was waiving his right to trial.

Applying the factors in *United States v. Yazzie*, 407 F.3d 1139, 1142 (10th Cir. 2005), the Court found that there was a "fair and just" reason to permit Jim to withdraw his guilty plea. (CR Doc. 53 at 22.) In its ruling, the Court noted, sua sponte, that Judge Puglisi had not informed Jim that he was waiving his right to a jury trial by signing the Plea Agreement. (Doc. 53 at 20 ("Chief Judge Puglisi did not inquire whether Jim understood that he was waiving the right to a jury trial. Chief Judge Puglisi did not use the word trial once throughout the colloquy.")). The Court further found "the failure to ask Jim any questions whether he understood that he was waiving his right to jury trial constitutes a fair and just reason to allow Jim to withdraw his guilty plea." (Doc. 53 at 21.) Additionally, the Court stated that, "[a]lthough the Plea Agreement lists the right to a jury trial as a right that Jim waived, the Court thinks that the plea colloquy casts enough doubt on the knowing and voluntary nature of the plea that Jim has met his burden to establish a fair and just reason to withdraw the plea." (Doc. 53 at 22.)

After balancing the *Yazzie* factors, the Court concluded "that it should permit Jim to withdraw his guilty plea based on the: (i) doubts about the knowing and voluntary nature of his guilty plea; (ii) new evidence; (iii) Jim's assertion of innocence; and (iv) deterioration of the lawyer/client relationship between Mr. Loonam and Jim." (Doc. 53 at 24.) Without deciding whether the plea was entered knowingly and voluntarily, the Court stated that its "doubts about Jim's knowing and voluntary waiver of his right to trial weigh heavily in favor of withdrawal." (Doc. 53 at 23); *Jim*, 786 F.3d at 808.

6

### D. Jim's Motion to Exclude

Chacon then filed a motion to exclude from admission at trial the Admission of Facts, Jim's statements during the Plea Hearing, and the Responsibility Statement. (CR Doc. 72 (the "Motion to Exclude").) Chacon argued that (1) the Rule 410 waiver "became null and void" when Jim withdrew the Plea Agreement, (2) admitting Jim's Admission of Facts would confuse the jury and waste the Court's time, and (3) the Rule 410 waiver in the Plea Agreement was "on it[]s face unconstitutional." (*Id*. at 2; Doc. 98 at 9 (setting out Jim's arguments).) At the motion hearing, Chacon asserted that "his main objection was that his investigator had discovered that there were many more photographs of the scene than Jim knew about at the time he entered the guilty plea," and that, consequently, Jim "did not enter into the Plea Agreement with all of the information available." (CR Doc. 98 at 13–14; *see also* Doc. 97 at 29:15–30:3.) Chacon argued that, because Jim was not fully informed of the evidence, he could not "wholly and voluntarily enter into the Plea Agreement." (CR Docs. 98 at 13–14; 97 at 30:25–31:2.) During the hearing, the Court noted that it had not ruled, in its order permitting withdrawal of the plea, on whether Jim's plea was made knowingly and voluntarily. (CR Doc. 97 at 33:24–34:1.)

The Court denied the Motion to Exclude. (CR Doc. 98.) The Court noted that Jim's conversations with the Court about the Plea Agreement, plea colloquy, and waiver of his right to trial were not under oath and found that Jim had "not presented an affirmative indication that his plea was unknowing or involuntary." (*Id*. at 1; *see id*. at 25, 41.) It also observed that, although the Court had expressed doubts about whether the Plea Agreement was made knowingly and voluntarily in its decision permitting Jim to withdraw his plea, "neither Jim nor his attorney [in arguing that the Admission of Facts should not be admitted at trial,] took the Court's doubts and concerns, and did anything to build on them to make an 'affirmative indication' that the plea was

7

not knowing and voluntary." (*Id*. at 42.) It further stated, "While the Court maintains doubts and concerns about whether Jim's plea was knowing, Jim has not argued that the reasons set forth in the Court's [decision on his motion to withdraw the plea] establish that his plea was unknowing and involuntary." (Doc. 98 at 49.) It therefore concluded, "In the absence of argument or evidence on this issue and with the burden resting on Jim, the Court will not invalidate the [R]ule 410 waiver and exclude Jim's statements on this ground." (*Id*.) After analyzing the text of Rule 410 and case law interpreting it, the Court also held that "the protections of [R]ule 410 do not extend to" the Responsibility Statement. (*Id*. at 56.)

After Jim was convicted, the Tenth Circuit Court of Appeals affirmed the Court's ruling. *Jim*, 786 F.3d 802. The Court noted that, in support of his appeal, Jim pointed "only to the doubts that the district court sua sponte raised about the knowing and voluntary nature of Jim's guilty plea," which were "based on 1) Jim's pro se assertion . . . , when Jim was seeking a new attorney, that Jim mistakenly thought that he would still have a jury trial, even after pleading guilty" and "2) the magistrate judge's failure to insure . . . that Jim understood that by pleading guilty, he was waiving his right to a jury trial." *Id*. at 812. The Tenth Circuit held that the district court's "doubts" were "insufficient for Jim to establish that his guilty plea was not knowing or voluntary" and "since that ruling, Jim offered neither his own testimony nor any other evidence that he believed he was retaining a right to proceed to trial notwithstanding clear language in the plea agreement to the contrary, nor did he renew that claim on his own in the district court." *Id*.

The Tenth Circuit Court's decision, however, did not rest entirely on the lack of such evidence. The Court held that "the written plea agreement and the circumstances surrounding Jim's entry of that plea show that Jim understood that, by pleading guilty, he would not have a trial." *Jim*, 786 F.3d at 812. In support, the Court cited *United States v. Tanner*, for the proposition that

8

"*either* the express language of the plea agreement, if sufficiently clear, detailed, and comprehensive, *or* the probing inquiry of a proper Rule 11 colloquy could be enough to conclude the waiver was knowing and voluntary." 721 F.3d 1231, 1234 (10th Cir. 2013) (per curiam) (emphasis added). After de novo review of the language of the Plea Agreement, the plea colloquy, and Jim's personal history, the Tenth Circuit held that, "the language in the plea agreement inform[ed] Jim that, by pleading guilty, he was giving up a trial, and the circumstances surrounding his entry of that plea that show that Jim was capable of understanding, and did understand, the terms of that agreement . . . ." *Id*. at 813. It therefore found "no error in the district court's ruling that Jim knowingly and voluntarily entered his guilty plea" and that the Admission of Facts and statements at the Plea Hearing were admissible at trial under the terms of the Plea Agreement. *Id*.; *see id*. at 809. The Tenth Circuit did not consider Jim's arguments that Rule 410 excludes admission at trial of the Responsibility Statement because the Government had not presented evidence of it at trial. *Id.* at 813 n.6.

### E.     The Evidence at Trial

To find that Jim had committed the charged crimes, the jury had to find that Jim is a Native American, that the incident occurred within the boundaries of the Navajo Nation, and that he "knowingly used force to cause [K.T.] to engage in a sexual act." (CR Doc. 134 at 16, 18.) A "sexual act" means "contact by his penis" with K.T.'s vulva (count 1) and anus (count 2), "however slight." (*Id*.; CR Doc 179 at 19–20.) Jim stipulated before trial that he was a Native American and that the incident occurred within the Navajo Nation. (CR Doc. 182 at 94:15–96:4.) Hence, because his defense was that he had consensual sex with K.T., the only dispute at trial was whether Jim forced K.T. to engage in sexual activity. (CR Doc. 179 at 47:22–23.)

As evidence of force, the Government put on testimony by K.T., two Sexual Assault Nurse Examiners (SANEs), an emergency room doctor, two of K.T.'s friends who were present at K.T.'s house in the early morning of August 13, 2010, and Criminal Investigator Jefferson Joe. (CR Docs. 179 at 49; 180 at 34, 92; 181 at 47, 152, 251; 182 at 55.) K.T. testified that she was lying on a couch when Jim grabbed her by her feet and dragged her off the couch and down the hall into her bedroom. (CR Doc. 180 at 119:1–17; 179:24–180:25.) In the bedroom, Jim removed her pants and underwear, and penetrated K.T. vaginally and anally with his penis. *(Id.* at 181:23–182:18; 119:18–120:7.) K.T. felt a "sharp pain" in her "bottom." (*Id*. at 119:20–21; 122:17–19.) Although she tried to push him off, Jim, who testified he was six feet tall and 235 pounds at the time, used his size and strength to hold K.T. down. (*Id*. at 119:25–120:4; 182:16–21; Doc. 183 at 117:22–118:8.) As they struggled, K.T. and Jim moved into the laundry room and, after a few minutes, Jim left through the exterior door in the laundry room. (Doc. 180 at 120:12–17; 183:12–25; 122:14.) K.T. was "trying to yell or scream" for her friend who was outside. (*Id*. at 120:16–17.) K.T. "fell to [her] knees" and crawled to the door leading out to the carport. (*Id*. at 122:21–23.) K.T.'s friends were gathered just outside the door, and one of them testified that she heard a scream before K.T. opened the door. (CR Docs. 180 at 122:25–122:1; 181 at 268:25–269:1.) Still naked from the waist down and crying, K.T. pulled herself up using the door for support, unlocked the door, and opened it. (CR Doc. 180 at 122:22–123:7.) K.T.'s friends testified that they saw her using the door handle to hold herself up and that K.T. was crying and unable to talk. (*Id*. at 214:15–215:9; 122:21–123:2; CR Doc. 181 at 180:24–182:12; 269:3–21.) Eventually K.T. told them that Jim had raped her and K.T.'s friends drove her to San Juan Regional Medical Center in Farmington, New Mexico. (CR Doc. 181 at 182:5–12; 187:4–25; 270:2–4.)

At the Medical Center, Dr. Graham Tull, the emergency room physician, examined K.T. (CR Doc. 181 at 48:20–24.) He testified that if "somebody comes in and there's no major injury to life or limb," the emergency room triage nurses will refer the patient to a SANE without first referring the patient to a doctor for examination. (*Id*. at 51:5–12.) He stated that "maybe two to three [patients per year] . . . require a physician to see them." (*Id*. at 51:16–19.) In this case, the triage nurse referred K.T. to him for exam. (*Id*. at 51:20–22.) Dr. Tull noted that K.T was experiencing "severe distress," which he defined as "somebody who might be writhing in the bed [and] extremely tearful . . . ." (*Id*. at 58:16–59:5.) Although Dr. Tull had never ordered a CT[5] scan on a sexual assault victim's abdomen before, he ordered a CT scan of K.T.'s abdomen because "of the amount of pain and the distress that she seemed to be in" and his concern that "there could be rectal tears, there could be vaginal tears." (*Id*. at 54:1–4; 53:15–19; 61:1–5.)

After Dr. Tull examined K.T., she was examined by SANE Margaret Finnan, who testified that K.T. told her that, assuming a pain level of ten was the "worst pain imaginable," her pain level was eight, and that K.T. had bruises on her forearms, back and knees. (CR Doc. 179 at 68:21-24.) In addition, K.T. sustained multiple lacerations to her vaginal area, some as large as 3.5 centimeters in length, and twelve lacerations to the area around her anus. (CR Doc. 179 at 83:7–85:3.) Finnan testified that she had never seen injuries like K.T.'s resulting from toilet paper or shaving. (CR Doc. 180 at 33:12–19.) Finnan read aloud K.T.'s written statement, in which she said that Jim "grabbed [her], threw [her] on the couch and held his hand over [her] mouth," dragged her into the

---

[5] "A computerized tomography (CT) scan combines a series of X-ray images taken from different angles around your body and uses computer processing to create cross-sectional images (slices) of the bones, blood vessels and soft tissues inside your body. CT scan images provide more-detailed information than plain X-rays do. . . . A CT scan can be used to visualize nearly all parts of the body and is used to diagnose disease or injury as well as to plan medical, surgical or radiation treatment." https://www.mayoclinic.org/tests-procedures/ct-scan/about/pac-20393675 (last accessed April 7, 2024).

bedroom, and "forced [her] legs apart . . . and forced his penis inside [her] vaginally" and rectally. (CR Doc. 179 at 62:20–63:4.) Another SANE testified as an expert that K.T.'s injuries were consistent with forced penetration and sexual assault, and that she had never seen injuries like K.T.'s resulting from consensual sex or toilet paper. (CR Doc. 180 at 51:2–4, 51:24–5:4, 53:18–55:17.) Criminal Investigator Joe met with K.T. at approximately 6:00 a.m. on August 13, 2010. He described K.T. as "obviously traumatized" and said that he "could tell that she was hurting abdominally, because she was kind of crunched over . . . ." (CR Doc. 182 at 61:18–62:4.)

The Government quoted Jim's Admission of Facts its opening statement and one of the Government's witnesses read it aloud, along with portions of Jim's testimony at the Plea Hearing. (CR Docs. 179 at 42:14–43:9; 180 at 82:20–88:8.) The Government also described the Admission of Facts and Jim's statements at the Plea Hearing again in its closing argument. (CR Doc. 183 at 160:10–19.) Jim repeatedly testified that other people prepared the Admission of Facts, he was afforded limited time to review it or discuss it with his attorney, he signed it only because his attorney told him to, and he did not admit the facts therein. (*See*, *e.g., id*. at 118:13–123:3.) Although the Government did not seek to admit the Responsibility Statement, Jim was asked if he recalled saying in that statement that he was "deeply sorry for [his] actions." (CR Doc. 183 at 114:22–25.) He testified that he did not make that statement, and, like the Admission of Facts, he had only signed the Responsibility Statement, which had been prepared by someone else, on the direction of his attorney. (*Id*. at 121:21–122:7.)

### F. Jim's Motion to Vacate

On June 1, 2021, Jim filed the Motion now before the Court, asking the Court to vacate his sentence. (Doc. 1.) The Government responded in opposition to the Motion on February 23, 2023. (Doc. 9.) Jim filed a reply on March 20, 2023. (Doc. 10.)

## II. LEGAL STANDARD

Pursuant to 28 U.S.C. § 2255(a), a federal prisoner who "claim[s] the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, . . . may move the court which imposed the sentence to vacate, set aside, or correct the sentence." This remedy "does not encompass all claimed errors in conviction and sentencing." *United States v. Addonizio*, 442 U.S. 178, 185 (1979); *United States v. Khan*, 835 F.2d 749, 753 (10th Cir. 1987). Rather, to prevail, the movant must show a defect in the proceedings which resulted in "a complete miscarriage of justice." *Davis v. United States*, 417 U.S. 333, 346 (1974) (quoting *Hill v. United States*, 368 U.S. 424, 429 (1962)).

Section 2255(b) requires the Court to hold an evidentiary hearing unless "the issues raised by [a Section 2255 motion are] conclusively determined either by the motion itself or by the 'files and records' in the trial court." *Machibroda v. United States*, 368 U.S. 487, 494 (1962) (quoting § 2255(b)). However, "[d]istrict courts are not required to hold evidentiary hearings in collateral attacks without a firm idea of what the testimony will encompass and how it will support a petitioner's claim." *United States v. Cervini*, 379 F.3d 987, 994 (10th Cir. 2004).

A defendant's claim that he was denied the effective assistance of counsel in violation of the Sixth Amendment is cognizable in Section 2255 proceedings. *See Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on a claim of ineffective assistance of counsel, the movant must satisfy both prongs of a two-part test. *Id.* at 687. "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* "If [the movant] is unable to show either 'deficient performance' or 'sufficient prejudice,' his claim of ineffective assistance necessarily fails." *Hooks v. Workman*, 606 F.3d 715, 724 (10th Cir. 2010). Hence, "it is not always necessary to address both *Strickland*

13

prongs. In particular, if [the movants are] unable to satisfy [their] burden under *Strickland*'s prejudice prong, it is unnecessary to determine whether counsel's performance was deficient." *Id*.

In reviewing an ineffective assistance claim, "[j]udicial scrutiny of counsel's performance must be highly deferential," and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Courts must "indulge a strong presumption that counsel's conduct" was reasonable. *Id.* For counsel's performance to be constitutionally defective, it must have been "completely unreasonable, not merely wrong." *Hoxsie v. Kerby*, 108 F.3d 1239, 1246 (10th Cir. 1997) (quoting *Hatch v. Oklahoma,* 58 F.3d 1447, 1459 (10th Cir.1995)). To show that counsel's conduct was unreasonable, a movant must show that counsel's conduct fell outside "the wide range of reasonable professional assistance that might be considered sound trial strategy." *Moore v. Reynolds*, 153 F.3d 1086, 1096 (10th Cir. 1998); *Strickland,* 466 U.S. at 689. This substantial burden that cannot be met by vague, general, or conclusory allegations; to prevail, a movant must allege specific conduct by counsel that was allegedly unreasonable. *Anderson v. Att'y Gen. of Kansas*, 425 F.3d 853, 859 (10th Cir. 2005).

To meet their burden on the prejudice prong, movants must show "that there is a reasonable probability that, but for counsel's error, 'the result of the proceeding would have been different.'" *United States v. Challoner,* 583 F.3d 745, 749 (10th Cir. 2009) (quoting *Strickland,* 466 U.S. at 694). In other words, they must show that "counsel's errors were so serious as to deprive [them] of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687. A "reasonable probability is a probability sufficient to undermine confidence in the outcome" of the trial. *Id*. at 694; *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011). Neither "mere speculation" nor "a conceivable effect on the outcome" is sufficient to satisfy the movant's burden. *Byrd*, 645 F.3d at 1173

("[S]peculation alone cannot give rise to a 'reasonable probability' that the outcome of the trial would have been different."); *Turrentine v. Mullin*, 390 F.3d 1181, 1205 (10th Cir. 2004) (showing that the error had a "conceivable effect" on the outcome is insufficient to show prejudice); *Strickland,* 466 U.S. at 693 (same).

Whether counsel's allegedly ineffective failure to suppress or exclude evidence prejudiced the movant depends on the role of the evidence at trial. *Strickland*, 466 U.S. at 695. "Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict . . . only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 695–96; *see Nickel v. Hannigan*, 97 F.3d 403, 408 (10th Cir. 1996) (no prejudice where, even if counsel should have moved to suppress a confession, other evidence, including other confessions, was sufficient to support the conviction); *United States v. Prows*, 118 F.3d 686, 693 (10th Cir. 1997) (stating that the movant had not shown "there is a reasonable probability that the outcome of the criminal trial against him would have been different [where] there was still overwhelming evidence from other witnesses, including [the movant] himself, to establish [his] guilt").

### III. ANALYSIS

Relying on the Court's references to his failure—despite the Court's "doubts"—to present an "affirmative indication" that he did not sign the Plea Agreement knowingly and voluntarily, Jim argues that Chacon's performance fell below reasonable standards when he failed to (1) argue in the Motion to Exclude that, because he did not understand he was waiving his right to trial, Jim did not sign the Plea Agreement knowingly and voluntarily, and (2) present Jim's sworn testimony in support of that argument, and that such failures were prejudicial because the Admission of Facts

15

and his affirmation of those facts at the Plea Hearing were admitted at trial. (Doc. 1 at 18, 31, 34.) I find that, even if Chacon's performance was deficient, Jim has not met his burden under the second *Strickland* prong to show that Chacon's "errors were so serious as to deprive [Jim] of a fair trial . . . whose result is reliable." *Strickland,* 466 U.S. at 687.

Jim argues that his Admission of Facts was the "most prejudicial of evidence" and analogizes his case to *Smith v. Wainwright*, 777 F.2d 609 (11th Cir. 1985). (Doc. 1 at 35–36.) In *Smith*, the Eleventh Circuit Court of Appeals held that defense counsel's failure to seek suppression of the defendant's confessions was "*extremely* prejudicial" because his "confessions provided the primary evidence offered and the only evidence which the state needed to convict him of first degree murder," which "eliminated the need for the state to submit any other evidence." *Smith*,777 F.2d at 616–17. It concluded, "Because Smith's trial counsel failed to move to suppress the confessions, the state's case was not subjected to the meaningful adversarial testing which is required under our system of justice." *Smith*, 777 F.2d at 617. The *Smith* Court relied on *United States v. Cronic*, in which United States Supreme Court held that, "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." 466 U.S. 648, 659 (1984); *see United States v. Collins*, 430 F.3d 1260, 1265 (10th Cir. 2005). However, this presumption of prejudice does not apply where "[d]efense counsel cross-examined the [Government's] guilt-stage witnesses, made objections to the [Government's] evidence, presented some evidence in [the p]etitioner's defense, and made opening and closing arguments." *Hooper v. Mullin*, 314 F.3d 1162, 1175 (10th Cir. 2002).

Jim contends that, like in *Smith*, his "confession was all the evidence [the Government] needed to convict him" and, therefore, the Court should presume prejudice without further

16

showing. (*See* Doc. 1 at 36.) But this case is not like *Smith*: The Government's case was subjected to "adversarial testing" and the Admission of Facts and Plea Hearing statements were not the "primary" evidence against Jim. *Smith*, 777 F.2d at 617. In addition to the Admission of Facts, the Government presented K.T.'s testimony, as well as extensive evidence of her physical injuries and emotional distress. Two experts testified that her injuries were not consistent with the defense theory of consensual sex or with the defense's suggestion that they could have been caused by toilet paper or shaving. (CR Docs. 179 at 110:24–112:3; 180 at 33:12–19, 51:2–4, 55:5–56:7.) Three other witnesses testified about K.T.'s emotional distress immediately following the encounter. Chacon extensively cross-examined these witnesses, presented two defense witnesses, made opening and closing arguments, and filed pretrial motions in limine. (CR Docs. 72; 179 at 43, 90; 180 at 5, 57, 127, 246; 182 at 105, 237, 256; 183 at 165.) Because the Government's evidence was meaningfully tested, Jim must show prejudice resulting from presentation at trial of the Admission of Facts and Plea Hearing statements. *See Hooper*, 314 F.3d at 1175.

Jim has not met that burden. While Jim is correct that a confession is "powerful evidence that 'is like no other evidence[,]'" its admission into evidence, even if improper or through incompetence, is not always prejudicial under *Strickland*. *Harmon v. Sharp*, 936 F.3d 1044, 1081–82 (10th Cir. 2019) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991)); *Wharton v. Vaughn*, No. CIV.A. 01-6049, 2012 WL 3535866, at *31 (E.D. Pa. Aug. 16, 2012) ("Although confessions are powerful evidence of guilt, attorney incompetence that results in the admission of an inculpatory statement does not automatically satisfy *Strickland*'s prejudice prong."), *aff'd in part, vacated in part on other grounds,* 722 F. App'x 268 (3d Cir. 2018). The Court must consider the relative significance of a confession in the context of the totality of the evidence at trial and determine whether the other evidence was sufficient to support the convictions. *See, e.g., Nickel*,

17

97 F.3d at 408 (no prejudice where, even if counsel should have moved to suppress a confession, other evidence, including other confessions, was sufficient to support the conviction); *Cummings v. Sirmons*, 506 F.3d 1211, 1229 (10th Cir. 2007) ("[G]iven the strong evidence of . . . guilt, we conclude that [the defendant] has failed to establish any prejudice arising out of trial counsel's purported failure to seek suppression of his statements to police."); *Saranchak v. Beard*, 616 F.3d 292, 307 (3d Cir. 2010) (petitioner failed to show a reasonable probability that "but for the admission of his [inculpatory] statements" the verdict "would have been different"); *Zamora v. Dugger*, 834 F.2d 956, 959 (11th Cir. 1987) (failure to move to suppress a confession was not prejudicial where "the state had abundant evidence (including other confessions) at its disposal with which to obtain a conviction"); *Sneed v. Norris*, 798 F.2d 471 (6th Cir. 1986) (unpublished) (failure to move to suppress "confessional statements" was not prejudicial where the evidence against the petitioner was "overwhelming"); *U.S. ex rel. Mahaffey v. Schomig*, No. 01 C 3677, 2001 WL 1464737, at *6 (N.D. Ill. Nov. 16, 2001) (no prejudice where, "even if his confession had been excluded from evidence, the outcome of [the] trial would have been the same because beyond [the] confession, the State presented evidence to establish [the defendant's] guilt beyond a reasonable doubt"), *aff'd sub nom. Mahaffey v. Schomig*, 294 F.3d 907 (7th Cir. 2002).

      Here, Jim does not address the totality of the evidence presented at trial and his conclusory assertions of prejudice are insufficient to show prejudice under *Strickland*. (Docs. 1; 10); *see Deardorff v. Raybon*, No. CV 17-00450-JB-MU, 2023 WL 2775158, at *3–4 (S.D. Ala. Apr. 4, 2023) (holding that the state court's determination that the petitioner had not shown prejudice was reasonable where the petitioner "made no reference to the abundant evidence admitted at trial, which the jury heard, that connected [the petitioner] to and implicated his guilt . . . ."). Moreover, I find that K.T.'s testimony, the expert testimony about her injuries, and testimony about her

distress immediately following the encounter supports the jury's finding that Jim used force, diminishing the effect of the contested evidence on the outcome of the trial. *See Strickland*, 466 at 695; *see* (CR Docs. 179 at 47 (the only dispute at trial was whether Jim used force); 183 at 165:24–25 (same).) In addition, the Government could have admitted the Responsibility Statement[6] in which Jim stated that he "used physical force to engage in a sexual act with [K.T.] against her will." *See* (CR Doc. 98 (holding that the Responsibility Statement was admissible at trial).); *Zamora*, 834 F.2d at 959 (failure to move to suppress a confession was not prejudicial where "the state had abundant evidence (including other confessions) at its disposal with which to obtain a conviction").

Having considered the totality of the evidence presented at trial, I find that the Motion and record conclusively establish that Jim was not prejudiced by such failure and, therefore, Jim has not met his burden under *Strickland*'s second prong. *Strickland,* 466 U.S. at 687. Because Jim has failed to demonstrate that he was prejudiced by his counsel's performance, the Court need not decide whether such performance fell below the standard for a reasonable attorney. *Hooks*, 606 F.3d at 724 (Courts do not address both prongs if the movant fails to make a sufficient showing of one).

---

[6] Jim cursorily argues that, had Chacon shown that Jim did not enter into the Plea Agreement knowingly and voluntarily, the Responsibility Statement also would have been "disallowed as evidence at his trial" because it was "fruit of [the] confessions" in the Plea Agreement and Plea Hearing. (Doc. 1 at 33.) He does not address the Court's detailed ruling that the Responsibility Statement does not fall within the protections of Rule 410, does not explain how the analysis of whether he knowingly and voluntarily entered into the Plea Agreement encompasses the subsequent Responsibility Statement, and does not cite to any authorities in support of his contention. (*Id.*; *see also* CR Doc. 98.) Even though Jim is pro se, the Court will not "construct a legal theory on a plaintiff's behalf" and, therefore, will not consider this assertion. *Whitney v. State of N.M.*, 113 F.3d 1170, 1173–74 (10th Cir. 1997); *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991) (the Court is not to "construct arguments or theories for the [pro se] plaintiff in the absence of any discussion of those issues").

## IV. CONCLUSION

Jim has not shown that he was prejudiced by the presentation at trial of the Admission of Facts and Plea Hearing statements and, therefore, has not shown that Chacon was ineffective under *Strickland*. I further find that an evidentiary hearing is not necessary because the record conclusively establishes that Jim is not entitled to relief. 28 U.S.C. § 2255(b).

**IT IS THEREFORE RECOMMENDED** that the Court **DENY** Jim's request for a hearing and **DISMISS** Jim's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Doc. 1) with prejudice.

> **THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the 14-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

_____
DAMIAN L. MARTINEZ
UNITED STATES MAGISTRATE JUDGE